IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:18-CV-00617-PAB-NYW

CSG SYSTEMS, INC., a Delaware corporation,

      Plaintiff,

v.

PEAKVIEW SOLUTIONS, LLC,
a Colorado limited liability company,

      Defendant.

## CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiff CSG Systems, Inc. hereby certifies that he did on

July 9, 2018, cause a true and correct copy of Plaintiff's REDACTED Consolidated Motion for

Preliminary Injunction attached hereto, to be filed with the Clerk of Court using the CM/ECF

system which will send notification and the availability of such filing to the following:

Chad T. Nitta
Blair E. Kanis
Thomas A. Isler
Kutak Rock LLP
1801 California Street, Suite 3000
Denver, Colorado 80202
Email:  Chad.Nitta@KutakRock.com
Email:  blair.kanis@kutakrock.com
Email:  thomas.isler@kutakrock.com

Dated this 9th day of July, 2018.

           *s/Lee F. Johnston*
           Lee F. Johnston
           Case Collard
           Andrea Ahn Wechter
           DORSEY & WHITNEY LLP
           1400 Wewatta Street, Suite 400
           Denver, CO 80202-5549
           Tel: 303-629-3400
           Email:  johnston.lee@dorsey.com
           Email:  collard.case@dorsey.com
           Email:  wechter.andrea@dorsey.com

           ***Attorneys for Plaintiff CSG Systems, Inc.***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:18-CV-00617-PAB-NYW

CSG SYSTEMS, INC., a Delaware corporation,

     Plaintiff,

v.

PEAKVIEW SOLUTIONS, LLC,
a Colorado limited liability company,

     Defendant.

---

## PLAINTIFF'S CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION

---

Pursuant to the Court's June 11, 2018 Minute Order (ECF No. 53), Plaintiff CSG Systems, Inc. ("CSG" or "Plaintiff") submits its Consolidated Motion for Preliminary Injunction ("PI Motion") to enjoin Defendant PeakView Solutions, LLC's ("PeakView" or "Defendant") continued use, reliance or disclosure of CSG's confidential, proprietary trade secret information more specifically identified herein.

### Certificate of Compliance with D.C.COLO.LCivR 7.1(a) and Fed. R. Civ. P. 65

The parties have conferred, and PeakView does not agree to the injunctive relief requested herein.

## I.  INTRODUCTION

At its core, this case is about a software company (PeakView) taking improper shortcuts in an effort to unseat another, long-standing incumbent competitor's (CSG) well-deserved and hard-earned position as the cable/communications industry's go-to provider of back-office, enterprise workforce management software solutions.  Without CSG's knowledge or

1



authorization, PeakView acquired documents from one of CSG's largest customers ████ ████████████████████ which PeakView knew, or should have known, contained CSG's confidential, proprietary information detailing the ████████████████ ████████████████████████████████████████ ████████████████████████████ Using this trade secret information—which CSG ████████████ develop and refine— PeakView ████████████████████████████ ████████████████████, and has usurped significant business opportunities at not only ████████████████ another long-time CSG customer.

CSG has suffered, and will continue to suffer, irreparable harm if PeakView's wrongful use and disclosure of CSG's trade secret information is not stopped pending trial on the merits. Beyond the inequity of forcing CSG to essentially compete against a product suite (AppointmentView and the AppointmentView API) embodying its own proprietary know-how, PeakView's wrongful conduct threatens CSG's reputation and ability to secure future engagements in the highly "sticky" enterprise software market which exists in the cable/communications industry.  The evidence uncovered through expedited discovery firmly supports a finding that CSG is likely to succeed on the merits of its claims for this wrongful misappropriation, and PeakView will not be harmed by the entry of a targeted injunction precluding it from any further use or disclosure of CSG's trade secret information.

Accordingly, CSG requests that the Court enter an order enjoining PeakView from any further use or disclosure of CSG's trade secret information (including the marketing or sale of

any product or service developed by PeakView based on CSG's trade secret information), contained in the following three documents unlawfully acquired and used by PeakView in connection with its work at ███████████████ :

(1) The scheduler API specification documents which PeakView obtained from ███████ ███████████████████ (collectively, the ████████████████ and ████████████████████████████████████████████████████████████

(2) The scheduler API specifications document which PeakView wrongfully disclosed and falsely represented as its own internally-developed AppointmentView API specifications to ████████ and another vendor ████████████████████ (hereinafter, the "PeakView Document"), ████████████████████████████████████████████████ and, ████████████████

(3) CSG's confidential ████████████ WFX ████████████ , and in particular, the PowerPoint slide deck ████████████ which PeakView wrongfully obtained at a time ████████ when it was still in the nascent stages of defining the logic of its own AppointmentView scheduler.

## II.
## FACTUAL BACKGROUND: FROM UNCOVERING THE "PEAKVIEW DOCUMENT" THROUGH FILING SUIT[1]

### A. The Parties.

#### 1. Plaintiff CSG

CSG was founded in 1982 and offers market-leading software products and professional services to telecommunication companies all over the world. CSG helps telecommunication companies, specifically cable and satellite companies, to manage the end-to-end lifecycle of a customer including customer care, order processing, billing, managing customer information,

---

[1]   For ease of reference, CSG has separately filed an "Appendix of Evidence In Support of CSG's Consolidated Motion for Preliminary Injunction," containing the declarations, deposition transcripts and exhibits, and additional documentary evidence supporting CSG's PI Motion. Citations to Appendix materials will be "**App. Exh. __**." Deposition exhibits are attached to their respective transcripts within the Appendix.

technician management, installations, service requests, and appointment times. ███████ ███████████████████████████████████████ CSG supports these business functions using a set of tightly integrated software systems. ██

    *2. Defendant PeakView.*

According to its website, PeakView was founded in 2006.  PeakView is a competitor of CSG and provides software integration and automation services to cable companies and other service providers.

**B.  CSG'S Confidential, Proprietary Information at Issue.**

    *1.  WFX and WFX Scheduling*

One of CSG's key products is a software suite known as Workforce Express ("WFX"). WFX works closely with CSG's "back end" billing and customer care solution, known as CSG's Advanced Convergent Platform™ ("ACP"). ████████████████████████ WFX intelligently manages the "workforce" of a company's service technicians in a given geographic area, defining the skills, areas, and shift times of technicians, dynamically and efficiently setting daily work schedules, using wireless devices for field technicians to perform their work, and so on. ████████████

One particular WFX module, known as Workforce Scheduling ("WFX Scheduling" or "WFX-S"), receives appointment requests from order entry systems and schedules appointments, optimizing resources and takes into account changes and customer appointment cancellations in real time. ████████ Old scheduling solutions were not centralized in a single program and therefore often required an unwieldly web of connections between multiple calendars and schedulers that made the necessary synchronization and updating processes unduly cumbersome and unreliable. ████████ WFX Scheduling provides a centralized, standalone solution that

works in concert with both CSG systems and the third party systems used by cable or satellite

companies. ████████

    *2. WFX-S API and the WFX-S API Documentation.*

When WFX Scheduling was initially developed, CSG developed ████████



████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

However, because not all customers used ████████████████████████ CSG also

developed an application programming interface ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ CSG created API specification

documentation to facilitate its ████████████████ to its ████████████

████████, and to encourage ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

The WFX-S API Documentation sets forth ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ In other words, the ████████

████████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

3.  *CSG's Competitive Advantage.*

To develop and maintain its status as an industry leader, CSG has repeatedly gone through the "software development life cycle," for WFX Scheduling and the WFX-S API—initially to develop the programs, and then heavily investing time and effort to improve on WFX Scheduling and the WFX-S API (and the corresponding documentation) to better optimize field resources, better respond to the constant shifts in schedules, increase productivity, lower costs, avoid lost opportunity, and increase customer satisfaction. ████████████████████████

████ This cycle never ends and develops through multiple and continuous planning, analysis, design, implementation, testing and integration, and maintenance steps. ████████████████

██████████████

4.  *CSG's Efforts to Maintain Confidentiality of Its Confidential and Proprietary Information.*

CSG protects its highly confidential, proprietary, and valuable information surrounding its software products, including ███████████████████████████████████████ ████████████████████ improper use or disclosure. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Internally, CSG maintains its WFX-S API Documentation ███████████████████

██████████████████████████████████████████████████████████

████████

_____

[2] Out of ████████ employees worldwide, ████████████████ can be accessed by approximately ████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

With respect to its customers, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Customers and their authorized third party

vendors ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████, and are prohibited from ███████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████ ███

**C. CSG's Discovery of PeakView's Improper Use and Disclosure of CSG's Confidential, Proprietary WFX-S API Information.**

*1. PeakView Competes with CSG for a New Opportunity at* ████████

████████████████ contacted CSG and requested information regarding CSG software

and services. ████████ expressed interest █████████████████████████████████

████████████████████████████████████ hoped to ████████████████████████

---

██████████████████████████████████████████████████████████████████████████

[3] CSG only provides access to its ███████████████████████ to a small number ████████

Access is restricted through ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

allowing ██████ to schedule appointments ██████████████████████████

██████████████████ CSG proposed implementation of WFX Scheduling, but ██████

ultimately selected awarded PeakView the contract to implement its newly-developed

AppointmentView solution. ██████████████

██████████████████ ██████ sent a meeting invitation by email to CSG, PeakView, and

another software and services provider, ██████ for a meeting to take place on ██████████

██████ *Id.* at ¶ 11.  The invitation was titled ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████ In

connection with that planned meeting, CSG entered into separate confidentiality agreements with

██████████████████ requiring the parties to safeguard and limit access and use of one

another's confidential information. ██████████████

    2.  *CSG Discovers PeakView's Unauthorized Acquisition, Use, and Disclosure of CSG's Confidential Information.*

Right before the meeting, on ██████████ ██████████ , ██████ replied to the meeting

invitation email (which included CSG recipients) indicating that, in preparation for that day's

meeting, it had a list of questions and comments ████████████████████████

████████████████████████████████████████ ██████████

████████████████████████████████████████████████████████

██ CSG personnel immediately recognized ████████████████████████

█████████████████████████████████ Incredibly, ████████████████████

verbatim language and information  (even

copying typos and spelling errors) ███████████████████████████████████

████████████████████████████. ██████████████████████████

███████████████████████████████████████ Shortly after

CSG received the PeakView Document, CSG was uninvited from the █████████

meeting with ███████ and PeakView. ██████████████████████ ██████

informed all recipients of the original meeting invitation email that ███████████

████████████████████████████████████████████████████████████

████████

### 3. PeakView's Refusal to Certify That It Has or Will Cease Using and Disclosing CSG's Confidential, Proprietary WFX-S API Information.

Immediately after CSG's receipt of the PeakView Document, CSG contacted Mr.

Schlabs, PeakView's Director of Application Development, and made it clear that the PeakView

Document contained CSG's confidential and proprietary WFX-S API information. ███████

███████████████ CSG demanded that PeakView immediately cease use of this information,

and requested information on who created the document, why the document was presented as

PeakView's and how it was to be used, and raised PeakView's potential violation of the

Confidentiality Agreement. ██

On ██████████████, the Chief Operating Officer of PeakView, Peter Locke, provided

PeakView's "response." Mr. Locke refused to identify the third party from whom PeakView had

---

[4]    A review of the Microsoft Word "properties" of the PeakView Document show that Matthew
Schlabs, Vice President of Architecture and Development at PeakView, ███████████████
████████████████████████████████████████

obtained  Of greater concern, however, was PeakView's refusal to provide any reliable confirmation that it had not and would not continue using or disclosing CSG's confidential, proprietary After further discussion, PeakView declined CSG's request for inspection of PeakView's work product for (to ensure it was not continuing to rely on CSG information) and PeakView did not return CSG's Although it offered vague representations that it would cease use of CSG's information and destroy any documents which contained CSG's information, PeakView refused to provide any concrete evidence that these actions had been taken (or even a timetable for compliance), or provide a certification under 28 U.S.C. § 1746 confirming its destruction of CSG's confidential information.

## III.
### FACTUAL BACKGROUND: EXPEDITED DISCOVERY REVEALS PEAKVIEW WRONGFULLY USED AND CONTINUES TO USE CSG'S TRADE SECRET INFORMATION.

The timeline revealed through expedited discovery shows when, how, and why PeakView needed to access CSG confidential information and incorporate it into its own products. PeakView was trying to unseat CSG from long-time existing customers and challenge CSG for new opportunities. PeakView could only do that by having a scheduler with functionality and interoperability that was on par with CSG's WFX-S product. PeakView's efforts to develop its own product were too slow and not yielding the results that its customers came to expect (in some cases based on their experience with CSG products). Rather than continue to develop their product in-house, PeakView caved to the pressure and took a shortcut,

relying on ████████████████████████ which PeakView knew or should have

████████████████████████████ WFX-S API information, ██████████

████████████████████████ PeakView then took that information to a new customer,

██████ to unlawfully compete with CSG once again.  Even when confronted by CSG,

PeakView only made half-hearted efforts to remove the CSG information and did not ultimately

do so.

**A.** ████████████████ **PeakView Scrambles to Meet** ████████ **Expectations and Capitalize on a "Game Changing" Business Opportunity to Develop a Scheduler.**

In ██████████, PeakView attended a meeting with ████████ concerning an opportunity

to ████████████████████████ to operate on ████████████ . ██████████████

████████████████████████████████████████ .  In the

months prior to the meeting, Matthew Schlabs and Manny Miera of PeakView ████████████

████████████████████████████████████████████

████████████████████████████

PeakView's scheduler, ██████████████████████████████████

████████████████████████████████████████████

████████████████████ PeakView put together a skeletal outline of its ██

██████ sometime between ██████████████ titled ██████████████████

██████ (referred to herein as the ██████████████████ and provided it to ██████ in

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████

4841-1612-9129\1

On ██████████████████ began pressing PeakView to get ██████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████ further

requested ███████████████████████████████████████████

███████████████████████████████ Faced with increasing pressure from

██████ regarding the time-sensitive nature of the projec ███████████████

██████████████████████, but knowing that its scheduler and API were non-existent

"vaporware," PeakView scrambled to put some window dressing on its skeletal ██████████

████████████████████████████████████████████████████████████████

██████████████████████

      PeakView's lack of progress on developing a standalone scheduler—or even drafting API

documentation for a standalone scheduler – continued through the remainder ██████████████

███████████████████████████████████████████████████████

██████████████████████ In fact, PeakView did not even begin drafting the

technical details needed for the first two ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████ Nevertheless, on ████████████, PeakView and ████████

entered into a Software License and Services Agreement. ████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ At that

time, ████████████████████████████████████████████

████████████████████████████████

On ████████████, PeakView participated in a full day meeting with ████████

regarding PeakView's scheduling application. ███████████████████████████

████████████████████████████████████████████ At the meeting,

████████, indicated that it wanted to take PeakView's then-existing APIs and see what either side

███████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ Importantly, however, █████████ also made it

clear that PeakView's scheduler API needed to adopt the ██████████ which was already in

place at ████████ and █████████████ close to formats for █████████ existing ███████████████.

████████████████████████████████████████████████

██████████████████████████████████

Critically, Parker's handwritten notes of the ██████████████████ █ ████

█████████████ confirm PeakView's knowledge that the then-existing █████████████ and the

█████████████ formats which ████████ asked it to adopt in its scheduler and scheduler API

were being supplied ████████████████████████████, both of which had

already been implemented in ███████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

Following the meeting, PeakView's founder and CEO, Manny Miera, emphasized to his

management team the importance of ███████████████████████████████

██████████████████████████████ In likely recognition that neither the

PointView scheduler nor the PointView API had even been documented, much less coded, Miera

observed ██████████████████████████████████████

██████████

**B.   ████████: PeakView Abandons Its Inadequate ██████████ Document and Shortcuts the Software Development Lifecycle.**

On ██████████, apparently tired of waiting for PeakView to develop an adequate

█████████████████████████████████████ sent PeakView version

1.0 of what it colloquially referred to as the ████████████████████████

██████████████████████████████████████████████

████████████   The "██████ Document" (which includes multiple versions, the last being

version 1.3.1) is not really ██████████ it is actually a "cut and paste" of CSG's confidential

██████████ information developed over the course of ██████████ and documented in

CSG's ████████████████ . ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████

The ██████ Document provided PeakView with critical ████████ which it

previously did not have and which it knew was developed by CSG.  Moreover, as embodied in

CSG's successful implementation of its ██████████████████████████

██████, this was ██████████ which "worked."  ██████ Indeed, the ████████ ████████ not

anything legitimately conceived by PeakView on its own, was a "game changer" in terms of PeakView's previous attempts to create its ███████████████. Compared to the █████ ████ PeakView's ████████████████████ was highly inadequate and far removed from being usable to develop ███████████.

PeakView now admits it abandoned independent development of its own █████████ ██████████ and instead, relied exclusively on the ████████████████ to code ████████████████████████ █████████████████████████████████████ ████████████████████████████████████ ██████████████████████ More importantly, PeakView did so knowing that the valuable ██████████ set forth in the ██████████ belonged to CSG. ███████ ██████████████████████████████████ █████████████████████████████████████ ██ ████████████

**C. ██████████: PeakView Improperly "Extracts" Confidential PowerPoint Slides From CSG's WFX ████████████████████ Detailing █████████████ ████████████**

In addition to the ███████ Document, PeakView improperly obtained slides from a confidential CSG PowerPoint ████████████████████████████ ████████████████████████████████████ The timing of this information was critical as PeakView was at that time developing its scheduler, ███████ and trying to better understand and leverage the ██████ Document it had recently received.

On ████████████, Mr. Miera sent Mr. Schlabs an initial, incomplete draft of a

15

████████████████████████████████████████████████████████

███████████████████████████████████████ As reflected in that document,

PeakView had not yet drafted the functional or technical requirements for its ███████████

it yet completed the ████████████████████████████████████████████

████████████ The very next day, on ██████████████, Mr. Schlabs sent Mr. Miera and two other

PeakView executives an email ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ Mr. Schlabs made it clear in his email that the three

PowerPoint slides were ████████████████████████████████████████████

████████████████████████████

The full PowerPoint presentation,██████████████████████████████████ was clearly

marked and identified as CSG's and included a full page ████████████████████████, in

part:

> The information contained within this document or application is the property of CSG, which is confidential and protected by international copyright laws and any unauthorized use of this document or application or its contents may violate copyright, trademark, and other laws.  No part of this document or application may be photocopied, reproduced or translated in any form or by any means, or stored in a retrieval system or transmitted electronically or otherwise, without the prior written consent of CSG.
>
> If you breach any of these terms, your authorization to use this document or application automatically terminates.  You may not modify this document or

---

[5] PeakView claims that it obtained access to CSG's ███████████████████████████████
███████████████████████████████ but has failed to produce any documentation substantiating this assertion.

application or its contents in any way or publicly display, perform, or distribute or otherwise use this document or application or its contents for any public or commercial purpose.  Any use of this document or application or its contents for any other purpose other than as mutually agreed upon with CSG is prohibited.

████████████████████████████████████████████████████████████

█████████████

The significance of the timing of PeakView's "extraction" and analysis of WFX Slide Deck cannot be overstated.  The WFX Slide Deck provides key insight on the ██████████ ██████████████████████████████████████████████ That insight into the function and operation of a working ████████████████████████████████ ██████████████████████████████████████ conveyed through the ████████ Document.  ██  At the time PeakView received CSG's ████████████ and extracted the ████████, PeakView had not coded its entire █████████████████████████████████ ███████████████████  In fact, only the ████████ component – ██ ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████

**D.**  **████████████: As Testing Begins, PeakView Internally Acknowledges that CSG was the Source of the ████████ Document and Further Shortcuts the Software Development Lifecycle.**

While PeakView's "development" of its scheduler and scheduler API continued between ████████████████████ and PeakView also began testing PeakView's initial versions of its scheduler APIs.  ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

It was during this testing period that, at a minimum, PeakView should have realized that CSG was the source of the ██████████ set forth in the ██████ Document. ██████ ██████████████████████ For example, on ██████████, ████████████████████████ emailed PeakView about its review of PeakView's requests and responses ***to*** ████████████ ████████████████████████████████████ Pursuant to the review, ██████████ identified ██ ██ from the ██████ Document and requested changes. ██████ ██████████ In response, PeakView internally acknowledged that ████████████████ ████████████████████████████████████████████ As another example, PeakView's ████████████████ arising out of its testing with ██████ makes clear that PeakView knew as early as ██████████, that ████████████████████ were being used at ██████ and that what it had received from ██████ was based on CSG's WFX-S API :



████████████████████████████████████████

Ultimately, PeakView's internal acknowledgement in ████████████████████ ████████████████████████████ lays to rest any doubt that PeakView knew the ██████

██████ contained, in fact, information provided by CSG's ████████████████████████

████████████████████████████████████

Beyond providing evidence of PeakView's knowledge regarding the source of the

information contained in the ██████████████, this testing phase provided PeakView with the

████████████████████████████████████████████████ In

particular, the testing phase provided valuable information to PeakView related to ████████████

████████████████████████████████████████████████████

████████████████████████████ For example, ████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ Similarly, in forwarding

version ██████████████ Document, ████████ provided PeakView with a document laying out

██████████████ that it could only have learned from ████████████████████████████

████████████████████████████████████.

**E.** ██████████████████ **Having Skipped Ahead in the Development Cycle, PeakView Launches PointView, But Soon Experiences Technical Issues Based on Its Lack of Direct Knowledge.**

PeakView was initially set to launch its PointView application in ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ However, issues persisted as testing

continued and PeakView—like a student who copied answers instead of doing the work

herself—did not have the underlying knowledge that would be theirs if they had designed it to troubleshoot and finalize its ▮▮▮ to work with the ▮▮▮▮ system. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Nor did ▮▮▮▮ for that matter.

For example, PeakView did not understand why it was asked to write ▮▮▮ to work with ▮▮▮▮ existing API with CSG which did not have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Due to issues like this, PeakView did not place PointView into production for the ▮▮▮▮▮▮▮▮ region until ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Even then, on the night of the delayed ▮▮▮ ▮▮▮ release of PointView, ▮▮▮▮ had a list of "must haves" that needed to be addressed by PeakView for the release. ▮▮▮▮

**F.**    **▮▮▮▮▮▮▮▮: PeakView Leverages Its ▮▮▮▮▮▮▮▮▮▮, Built on CSG's WFX-S API Information Set Forth in the ▮▮▮▮ Document, to Expand Opportunities with ▮▮▮▮**

In ▮▮▮▮▮▮—just days before CSG's discovery of the PeakView Document— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a pilot evaluation of its PointView Scheduler – which PeakView now referred to as "AppointmentView" – in ▮▮▮▮▮▮ market. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PeakView conceded that it intended to use ▮▮▮▮▮▮▮▮▮▮ which was developed using the ▮▮▮▮ Document and "in production" in the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

**G.** ██████████████ **: PeakView Uses the** ██████ **Document to Win** ██████
**Business.**

In ██████████, PeakView began discussions with ██████ concerning its AppointmentView scheduler. ██████████████████████. On ██████████, PeakView emailed ██████ stating that it was ████████████████████████ ████████████████████████████████

Just a few days later, on ██████████ PeakView circulated version ██████████ Document internally with the subject title ████████████████████████ ███████████████████

On ██████████, PeakView participated in a meeting with ██████ and ██████ in connection with the ██████ opportunity. ████████████████████ ████████████████ PeakView was directed to provide ██████ with its ██████ ██████ specifications for AppointmentView, which was understood to mean PeakView's specifications for the ████████████████████████████ ████████████████████████ ████████████████

As discussed, on ██████████, PeakView provided ████████████████ ████████████████████████████ ████████████████ This API document, referred to in CSG's Complaint as the PeakView Document, is simply a slimmed down version of the ██████ Document. ████████████████████████ ████████████████████████ ████████████████████████

████████████████████████████ Importantly, the PeakView Document was clearly

intended to serve as the base scheduler API documentation for ██████ subject to modifications.

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

This section of the timeline is critical: ***Just one day*** after PeakView's provision of ████

████████████████████████████████ declined CSG's proposal to implement CSG's

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Although unknown to CSG at the time, it had lost out to

PeakView on the ██████ opportunity because PeakView had just made a proposal that included

***CSG's*** confidential information.

**H.   ██████████████████: PeakView Superficially Modifies the ████████ Document Under the Guise of Reverting Back to Its Original Work Order API Document.**

Almost immediately following CSG's notice and in a transparent attempt to cover its

tracks, PeakView communicated with ██████ that the API document previously provided would

***not*** be the API that will be used for ██████ project. ███████████████████████

███████████████████████████████████████████

Subsequently, ██████████████████████████████████

████████████████████████████████████  ████████████

████████████████ This API document was purportedly version ██ of the skeleton

Work Order API Document PeakView had first provided ██████ way back in █████████████

████████████████████████ In reality, as discussed below, the



By ███████████, PeakView had also reached out to ██████ to inform it that PeakView had come up with its own, "new" API scheduling documentation to support the AppointmentView ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ However, once PeakView went beyond the cosmetic name changes, it quickly realized that exclusively relying on its own, original API specifications document was problematic.  Indeed, critical gaps in functionality and operation between PeakView's own, original API specifications and the more robust, CSG-based API specifications set forth in the ██████ Document, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Over the following weeks, PeakView continued to identify gaps between what was in production at ██████ and the AppointmentView API Document. ████████████████████████████

Ultimately, however, the effort to develop home-grown solutions proved to be too much for both ██████ and PeakView. ████████████████████████████████████ ████████████████████████ For its part, ██████ chose not to implement any modifications to the scheduler API which PeakView had developed using CSG's WFX-S API information contained in the ██████ Document ██ ████████████████████████████████, and has since cut off ████████████████████████████████████████████

For its part, PeakView has apparently concluded that the effort needed to develop its own

scheduler API specifications which are on par with CSG's robust API specifications is either too

great or beyond its developers' capabilities, and has chosen to continue to exploit important

aspects of CSG's WFX-S API information it gained from the ██████ Document.   Nowhere is

this better illustrated than a comparison of PeakView's original Work Order API Document

(provided to ████████████) and its current "new" AppointmentView API Document

being used at ████.

Indeed, the differences between PeakView's original Work Order API Document

provided to ██████████ and the current AppointmentView API Document (and the

modifications thereto) are significant. ██████████████ That is, the current

AppointmentView API Document is a far cry from where PeakView had left off in its own

originally-developed API documentation for its then-scheduler PointView back in ████████

Indeed, in the ████████ since CSG first raised its concerns about the PeakView Document on

████████████, PeakView appears to have made only superficial modifications to its

AppointmentView API Document, and has essentially added back in CSG's WFX-S API

operational logic and functionality as part of its "gap analysis." ████████████████

████████████████████████████████████████

████   The latest version of the AppointmentView API Document – version ██████████

████████████████████████ still contains key elements of

CSG's confidential, proprietary WFX-S API information set forth in the ██████ and PeakView

Documents. ████████████████████████

**I.   <u>Present</u>: PeakView Continues to Use CSG's Trade Secrets.**

Because PeakView's AppointmentView API Document failed to actually remove CSG's

confidential information, it is clear that PeakView's scheduler (AppointmentView) and scheduler

API continue to unlawfully exploit CSG's trade secrets in connection with PeakView's current

work for ▮▮▮▮ and future work for other customers. ▮

## IV.   ARGUMENT

### A.  Legal Standard

While it is an extraordinary remedy, an injunction should issue when the right to relief is

clear and unequivocal. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d

1149, 1154 (10th Cir. 2001); *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir.

1991).  To obtain injunctive relief, a party must show that: "(1) it will suffer irreparable injury

unless the injunction issues, (2) the threatened injury outweighs any damage the proposed

injunction may cause the opposing party, (3) if issued, the injunction would not be adverse to the

public interest, and (4) it has a substantial likelihood of success on the merits." *Okla. Ex rel*

*Okla. Tax Comm'n v. Int'l registration Plan, Inc.*, 455 F.3d 1107, 1112-13 (10th Cir. 2006).  If

the plaintiff can establish that the first three requirements "tip strongly in his favor, the test is

modified, and the plaintiff may meet the requirement for showing success on the merits by

showing that questions going to the merits are so serious, substantial, difficult and doubtful as to

make the issue ripe for litigation and deserving of more deliberate investigation." *Greater*

*Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 2003).

### B.  CSG Has Satisfied the Tenth Circuit's Four-Part Test for Entry of the Narrow Injunction Sought.

The testimony and documents obtained through expedited discovery have fleshed out a

troubling picture regarding PeakView's widespread past and ongoing misappropriation of CSG's

trade secrets and confidential information:

- Upon receipt of the ▉▉▉ Document, PeakView set aside any API documentation it had been working on and coded its scheduler API to the ▉▉▉ Document. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

- PeakView knew or should have known that the information it obtained from ▉▉▉ was CSG's at least during the testing phase of its API with ▉▉▉ and admitted that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

- PeakView used the information to develop a competing product at ▉▉▉ much faster than it could have without it. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

- PeakView gained further insight through the testing process and by "extracting" CSG information from the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

- PeakView did not stop at ▉▉▉ and took the CSG information to compete against CSG for another common customer, ▉▉▉—which actually resulted in CSG losing the opportunity. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

4841-1612-9129\1

███████████████████████████████████████████

███████████████████████████████████████████

- PeakView's half-hearted attempts to excise CSG's confidential, proprietary information and critical logic from the current version of its AppointmentView API are unavailing. ██████████████████████████

These facts show that CSG has and will continue to suffer actual irreparable harm from lost opportunities and diminished competitive advantage due to PeakView's ill-gotten head start. PeakView cannot be harmed by the injunction because it has essentially admitted that it ***should*** remove any information that originated from CSG from its own products. Thus far, PeakView has failed to do this, and it is clear that this Court's intervention is required. Finally, there has been no showing during expedited discovery that suggests that CSG will not prevail on the merits of its claims or that an injunction would harm the public interest. The Court should enter CSG's requested targeted injunction.

1. *CSG is Suffering, and Will Continue to Suffer, Incalculable and Irreparable Harm in the Absence of Injunctive Relief.*

Expedited discovery has revealed that PeakView unlawfully acquired, and has in its possession, more than just the CSG WFX-S API information set forth in the PeakView Document. In addition to the PeakView Document, PeakView has numerous versions of the ████ Document from which the PeakView Document was derived. ██████████████████

█████████████████████████████████████████████

█████████████████████████████████████

████████████████████████ PeakView also gained valuable information during its API testing with ███████████████████████████

27

█████ and admittedly extracted the WFX Slide Deck related to ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

PeakView gained an improper head start from the valuable, proprietary CSG-based

scheduler API information it (PeakView) acquired. ████████████████████████████

Upon receipt of the ███████ Document, PeakView admittedly abandoned work on the skeleton

API document it had initially sent to ████████ in ████████ and coded its scheduler API to the

███████ Document.  At the time PeakView received the ███████ Document, its own API

document was inadequate and incomplete for the purposes of actually coding the PointView API.

████████.  Using the ███████ Document and the WFX Slide Deck, both of which contained

valuable, fully functional ████████████████████████████ PeakView

developed its scheduler API and PointView scheduler and continued to modify both using

valuable information gained during the testing phase.  ███████ *see LSI Logic Corp. v.*

*Broadcom Corp.*, 2005 Colo. Dist LEXIS 39, *4-5 (Colo. Dist. Aug. 1, 2005) ("[I]t is use to

know what works and what does not work" as "avoiding a blind alley can save tens of thousands

of dollars and weeks or months of development time.").

PeakView's continued use and disclosure of CSG's confidential, proprietary WFX-S API

information will diminish the competitive advantage CSG has built with its innovative,

standalone WFX Scheduling product.  ████████████████████████████

████████████████████████.  As set forth above, it is clear that there is high demand

from large service providers—████████████████████—for CSG's unique, standalone

scheduler and all of the benefits it provides.  CSG and PeakView are direct competitors.  ███████

██████████████████ If PeakView is permitted to market and sell its own standalone scheduling system – AppointmentView and the AppointmentView API – in its current, inadequately modified state, CSG's competitive advantage will be eliminated, resulting in irreparable harm. *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 868 F. Supp.2d 359, 374 (D. Del. 2012) ("[D]irect competition in a marketplace weighs heavily in favor of a finding of irreparable injury."); *see also Xantrex*, 2008 U.S. Dist. LEXIS 41206 at *41 (finding that the value of the use of trade secrets is "not directly compensable with money damages"); *cf. Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F. 3d 1336, 1345 (Fed. Cir. 2013) ("[w]here two companies are in competition against one another, the patentee suffers the harm – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions.").

Indeed, CSG's goodwill and reputation will suffer, resulting in irreparable harm. CSG has a reputation as a company with a revolutionary WFX platform offering the innovative, standalone WFX Scheduling. ████████████████████████████ ███████████████████ PeakView's use of WFX-S API Documentation to create its own "innovative" competing scheduler will result in irreparable harm to CSG. These harms are both irreversible and unquantifiable. *See Douglas Dynamics*, 717 F.3d at 1344-45 (the "reputation as an innovator will certainly be damaged if customers found the same 'innovation' appearing in competitors' [products]"); *3M Unitek Corp. v. Ormco Co.*, 96 F. Supp.2d 1042, 1051 (C.D. Cal. 2000) (noting that if defendant is allowed to free ride on plaintiffs' innovation and technological achievements defendant will permanently injure plaintiffs' reputation and goodwill).

Moreover, the nature of the enterprise software market exacerbates the irreparable harm CSG will suffer absent an injunction.  Once a customer selects a software vendor for its solution for a particular project, it typically then "sticks" with that vendor for future software development needs.  ██████████████████████  Reputation in the software development industry is built on repeat engagements by well-respected customers.  ██  Any opportunity that PeakView usurps through its misappropriation of CSG's WFX-S API information will result in lost customer opportunities which cannot be quantified or fully known, but which most certainly will damage CSG's reputation and competitive advantage in the future.  ██████████ ██████████████████████  Courts have found these circumstances justify the equitable relief CSG seeks here.  *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1336 (Fed. Cir. 2013) (affirming a district court finding that "money damages were inadequate [. . . ] largely due to incumbency effects from the [. . .] market conditions"); *Haggard v. Spine*, No. 09-cv-00721-CMA-KMT, 2009 WL 1655030, at *15 (D. Colo. June 12, 2009) ("resulting loss of competitive advantage could not be undone by money damages"); *see also Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp.2d 118, 131 (S.D.N.Y. 2000) ("potential loss of market advantage has been recognized to constitute irreparable harm"); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) ("years after infringement has begun, it may be impossible to restore a patentee's [] exclusive position by an award of damages and permanent injunction").

Finally, absent injunctive relief, the prospects of future irreparable harm to CSG are all but certain.  *Schrier v. University of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005).  PeakView took full advantage of the ill-gotten head start it received with respect to its development of a

scheduler API and PointView scheduler for ▮▮▮▮ and almost immediately leveraged its

misappropriation to win ▮▮▮▮ engagement, all at CSG's expense and all the while asserting

it had no "direct knowledge" that the information from which it coded and developed its

scheduler and scheduler API originated from its competitor, CSG.[7]  Indeed, PeakView's conduct

since being alerted to CSG's concerns ▮▮▮▮ underscore the need for this Court's

intervention.  Beginning with its vague and misleading responses to ▮▮▮▮

e-mail inquiries and its refusal to certify under penalty of perjury that it had destroyed and ceased

use of CSG's confidential WFX-S API information, and continuing through today with its

inadequate modifications to its current AppointmentView API specifications document,

PeakView has demonstrated that a Court order is needed to stop to PeakView's unlawful use of

CSG's trade secrets and prevent further irreparable harm to CSG.

    2.  *The Balance of Harms Favors CSG.*

       The harm that CSG would sustain without an injunction (set forth above) outweighs any

alleged harm the injunction would cause on PeakView, and thus, this factor favors an injunction.

*See Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 944 F.3d 1476, 1498 (10th Cir. 1993).  The

harm to CSG detailed above is significant.  On the other hand, no harm would result to

PeakView by precluding it from using or disclosing information contained in the PeakView

Document, ▮▮▮▮ Document, or the WFX Slide Deck.  PeakView essentially admits that any

---

[6] Not only did PeakView move forward with the ▮▮▮▮ opportunity in ▮▮▮▮
with the use of the ▮▮▮▮ Document, it also planned to use the ▮▮▮▮ document to usurp
CSG's planned ▮▮▮▮

[7] In his deposition, Mr. Schlabs went so far as to make the remarkable claim that ▮▮▮▮

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ However, while PeakView asserts

that it ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████ its efforts to superficially modify the AppointmentView API Document were

inadequate. ████████████████████████████████ An injunction requiring **complete**

performance of what PeakView already acknowledges as proper and required fails to support any

alleged harm to PeakView.  Indeed, "[a] knowing infringer cannot be permitted to construct its

business around its infringement." *Autoskill*, 994 F.2d at 1498.  The balance supports an

injunction.

> 3. *CSG Has Demonstrated a Substantial Likelihood of Success on the Merits.*

To demonstrate a likelihood of success, CSG must make only a *prima facie* showing of a

probable right to the ultimate relief, and a probable danger of injury if the motion is denied.  *See*

*Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp.2d 1216, 1221 (D. Colo. 2001).  Based on the

above showings, CSG only needs to raise a substantial question going to the merits "as to make

the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone*

*Coalition*, 321 F.3d at 1255-56.  Expedited discovery only further supports PeakView's

misappropriation of CSG's trade secrets set forth in the PeakView Document, ███████

Document, and WFX Slide Deck.  Accordingly, CSG is likely to prevail on its misappropriation

claims brought under the Colorado Uniform Trade Secrets Act ("CUTSA") and the Defend

Trade Secrets Act ("DTSA").

It is undisputed that the information contained in these documents belong to CSG and have competitive value based on their secrecy, and thus, fall well-within the definition of "trade secrets" under the CUTSA and DTSA. PeakView concedes that at least certain information contained in its own ███████████████████████ was confidential, proprietary, and of competitive value. ███████████████████████ PeakView also designated its own API documents, including the ███████████████████ as "Highly Confidential – Attorneys' Eyes Only" in producing the same. ████████████████████ ██████████ Finally, the value of CSG's proprietary approach was confirmed when ██████ cut off ███████████████ with PeakView rather than stop using the CSG-based scheduler API specifications set forth in the ██████ Document. ████████████████████████ ████████████████████████████████████████████

CSG has taken reasonable steps to maintain the confidentiality of its trade secrets as set forth above. As clarified during discovery, WFX-S API Documentation is not only maintained ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████ Additionally, access to the WFX-S API Documentation is limited ████████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████

█████████████████████████████

PeakView admits that it developed its scheduler API from the ████ Document and that it derived information contained in the PeakView Document from the ████ Document. All of this was done without CSG's express or implied approval, consent or authorization and constitutes misappropriation. CSG will likely prevail on its trade secrets claims under CUTSA and DTSA, and this Court should grant the requested targeted injunction against PeakView.

4.   *The Injunctive Relief Sought by CSG Will Not Disserve the Public Interest.*

"[T]he public never benefits from trade secret misappropriation." *Xantrex*, 2008 U.S. Dist. LEXIS 41206 at *44. The public would not benefit from permitting PeakView to continue to misappropriate CSG's trade secrets and confidential information. The injunction will work to protect and preserve CSG's WFX-S API, WFX-S API Documentation, and WFX Scheduling, which have been a key factor to its success and are critical to its ongoing competitive advantage.

████████████████████████████████████████

This is especially true as PeakView has already used and disclosed ████████████ and has refused to provide a certification that it has destroyed all API and API Documents in its possession. ████████████████████ Public interest weighs in favor of granting the injunction.

5.   *Only Minimal Security, if any, Is Appropriate for the Injunctive Relief Sought.*

This Court "has 'wide discretion' under Rule 65(c) in determining whether to require security" for an injunction. *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1201, 1206 (10th Cir. 2002). A bond is unnecessary absent proof of a likelihood of harm to the defendant. *Id.* No bond should be imposed because PeakView will not suffer any cognizable harm as a result of

the narrowly tailored injunction requested by CSG.  In the alternative, CSG submits that the

bond payment be a minimal amount, as PeakView will not suffer any harm if enjoined from its

wrongful conduct of using and disclosing CSG's confidential and proprietary information and

trade secrets for its own benefit.  CSG proposes that $5,000.00 is an appropriate amount.

## V. CONCLUSION

WHEREFORE, Plaintiff CSG Systems, Inc. respectfully requests that the Court enter an

Order preliminarily enjoining Defendant, its officers, directors, agents, servants and employees,

and all others aiding, abetting or acting in concert with and acting with knowledge thereof, from

using, relying and/or disclosing, in whole or in part, the information set for in of any version of:

(a) the █████ Document(s); (b) the PeakView Document(s); and (c) the WFX Slide Decks;

and for such further relief as the court deems equitable.

Respectfully submitted this 13th day of June, 2018.

*s/Lee F. Johnston*
Lee F. Johnston
Case Collard
Andrea Ahn Wechter
DORSEY & WHITNEY LLP
1400 Wewatta Street, Suite 400
Denver, CO 80202-5549
Tel: 303-629-3400
Email: johnston.lee@dorsey.com
Email: collard.case@dorsey.com
Email: wechter.andrea@dorsey.com

*Attorneys for Plaintiff CSG Systems, Inc.*

4841-1612-9129\1

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on June 13, 2018, I caused the foregoing document, titled **PLAINTIFF'S CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION** to be filed with the Clerk of Court using the CM/ECF system which will send notification and the availability of such filing to the following email address:

Chad T. Nitta
Blair E. Kanis
Thomas A. Isler
Kutak Rock LLP
1801 California Street, Suite 3000
Denver, Colorado 80202
Office 303-292-7721
Email: Chad.Nitta@KutakRock.com
Email: blair.kanis@kutakrock.com
Email: thomas.isler@kutakrock.com

s/ *Lee F. Johnston*
Lee F. Johnston
Dorsey & Whitney LLP
1400 Wewatta Street, Suite 400
Denver, CO 80202-5549
Tel: 303-629-3400
Email: johnston.lee@dorsey.com

*Attorneys for Plaintiff CSG Systems, Inc.*

36